Will the clerk please call the next case? Jeffrey Gerasi v. Gilbane Building Company Counsel, they're going to argue. Please step forward. Introduce yourselves and proximate how much time. Good morning, Your Honor. Pat Zwerg, head of the plaintiff and the appellants at Gerasi. I'm proud to be on the defense. Good morning, Your Honor. David Seffi for defendant Gilbane Building Company. We would request 20 minutes. Okay. Fine. Thank you. Your Honor's counsel. As I stated again, my name is Pat Zwerg on behalf of the plaintiff, Jeffrey Gerasi. First of all, again, happy Valentine's Day. Thank you. I know this case has been pending for a while before the court. Briefs have been filed some time ago. Thank you for holding this case. For the Carney case which came out in the Supreme Court in October of last year, it is our belief that that case clarified significant portions of the law in this area which a plaintiff has based his cause of action upon. And that cause of action in the way that I had made it present to the court to boil it down is a condition of the property which has elements of control and what the defendant could have done about it. So the condition of the property, as we've said throughout this case, was the enormous amount of active energy that was running through this building. As your Honors know from the briefs, this is AT&T Control Center and the policy was to keep this energy up. The action was that we hoped to prove to your Honors what they should have done about it in light of that action, in light of that dangerous condition. Before you get into what they should have done, Carney clarified that 414 does not address vicarious liability. And in your opening brief, you argued that you were pursuing both vicarious and direct liability against Gilbay. Are you pursuing vicarious liability? We're pursuing direct liability. Our complaint is asking for direct liability. So there is no vicarious liability? There's no vicarious liability for two reasons. One, we're not pursuing it. Another reason is I'm not sure it's a viable cause of action anymore. If we were to pursue something that had any similarities to vicarious liability, if your Honors would allow us, we'd go back. The trial court, we allege, is some form of agency theory and there are certain contractual provisions which may allow us to do it. But as to your question, no, we are not asking that vicarious liability be a basis for your decision. If we were to do so, it would be under Section 409 of the Restatement, as Justice Tice explained, that's an agency provision and that is not contained in our Third Amendment complaint, which is currently before the court. The other major item that Justice Tice and the courts, save the dissent of Justice Kilbright, clarified in the Carney case was the rubric of control. Now, the most important thing to remember, though, is that that case concerned an owner, it concerned a nationwide railroad company. There was several salient facts in that, but the biggest fact this court should keep in mind and why the result of that case is at least distinguishable is because the nationwide railroad company was simply the owner and they subcontracted out various provisions dealing with the safety of this project to the general contractor. The general contractor in that case was Haps Construction, who had a handshake deal with a demolition company. Haps Construction was the general contractor that stood in a similar place that Gilbane is standing today and Haps settled out on that case before the case got to the appellate court. So, the court was not able to address whatever the duties were of the general contractor, which is what we are asking the court to address today. So, let me ask you, Mr. Dwyer, when both Gary's owner and the plaintiff's immediate supervisor testify that had they seen Mr. Geraci performing the tie-in on the date of the accident in the way he did, they wouldn't have stopped him and they wouldn't have told him to do anything differently because they didn't believe it was dangerous. How can Gilbane be faulted under those circumstances? Certainly, Your Honor, I believe if that testimony is in the record, there's certainly testimony that contradicts that, particularly what's found in the testimony of Frank Berg and Brian Geraci. You're talking about expert opinion, but I'm talking about the actual people who were on site. And you can't have an expert substitute or provide an essential element when the evidence doesn't support it. And so, Gary itself said they thought the risk to Mr. Geraci was zero. And Gary wasn't correct. It's not just post hoc that that rationalization is correct. But they're asking their employee, who has no choice in the matter, who's working for a subcontractor who has a contract with the general contractor who has a contract with the owner, to go into that space. And they're clearly sending him into a space which had live energy. Now, yes, there was that testimony in the record. I'm not sure exactly where that was. But the fact is, he was approaching a 480-volt circuit breaker where the load side was on under it. And there's rules, NFB 70E, which govern that type of breaker. Now, whether or not you get to the expert testimony, there already are facts that this was a highly charged piece of equipment that still had electricity or the load side was still powered up, so to speak, for lack of a better word, excuse me, in the layman. And the line side was off. It may have been their belief, but we settled with that defendant. That defendant was wrong. That's why they settled out of the case. That's the premises liability against AT&T. Sure. And JCI, who was the manager of the building, it was JCI's responsibility to make sure that those breakers were functioning and safe to work on. I'm having a hard time to articulate how Gilbane figures into that. Well, Gilbane, as we cited to the contracts and particularly the Gilbane safety plan, they didn't just have a contract to provide safety to the chiller replacement project. Their contract said they had to have active control over the property. The contract said, the Gilbane safety plan, which I'm referring to, is that there had to be lockout, tagout procedures on all the electrical devices. But did Gilbane, is there any evidence that Gilbane had any knowledge that the breaker was defective? As to the breaker being defective, the breaker itself was 20 years old. But Gilbane, is there any evidence that they knew or should have known that it was defective? I'd have to defer to the expert's testimony, but the mere fact that this chiller replacement project was using a breaker that was 20 years old that had not been used in six years, they should have known. How would they have known that? Through their active control through the... They didn't know if it was for 20 years. Does that mean that if we rule in your favor that the contractor has to go through every piece of equipment in the building to find out how old it is and what repair it is? No, of course not. That's why we're asking that the court focus on the rule that was already in place, which is its common knowledge. By the way, it's minimum level of safety that there be lockout, tagout procedures. So it's known in general that high voltage equipment is dangerous to a worker. Maybe it's particularly so with the broke breaker, which may be old or may not be old. But they know this is dangerous equipment. They know that there should be a general policy for any breaker, whether it's old or not old. For every single breaker, there's this lockout, tagout policy. So is there any evidence that, in practice, lockout, tagout was ever used for temporary tie-ins? In practice, we have evidence in the deposition testimony. There was Thomas Person, who was the Gilbane point man. On previous projects, there was lockout, tagout on similar facilities. Of course, there's the post-remedial measure in this case, where after the accident happened, there was an email sent around. The email that Tom Person eventually sent around and promulgated said that the motor control center, which controlled this or any other circuit breaker, could be shut off. But even after, it never was. They said in this new MOP, the method of procedure, that these motor control centers could be de-energized from there on out. Could be. Not that they had to be. Not that lockout, tagout would apply. Maybe my language is a little loose, but that was the method of procedure that was put in place after the accident. So that goes both to show control over the means and methods of this job, and also goes to show the feasibility of any measures which might have prevented this accident or would protect future workers. And that evidence is admissible for those two things, although it is not admissible to prove negligence. So the day after, when they learned of Mr. Geraci's accident, they were confronted with the facts of the accident, and they changed their plan and required procedures to be employed so that this would not happen again because it caused injury to a subcontractor's employee. And they did that because they had control under the 64-page project safety plan authored by Gil Bain, correct? That's exactly right.  And it's a question of fact whether they exercised or should have exercised that control reasonably, which is, in my judgment, a fact question that should not have been decided by Judge Flannery in summary judgment because Judge Flannery said there's not sufficient evidence that Gil Bain knew what Geraci was doing. But knowledge under 414 is not required. It's controlled. Am I wrong? I think maybe Mr. Dwyer agrees with you. I don't know. I'd like to hear him say that I'm looking at it the way you're presenting it. I couldn't agree more. That's absolutely the basis of our case. It's the jury instructions, the law, the restatement itself uses the word controlled. Sure, notice is part of an analysis and the premises liability and the negligence standards kind of bleed into each other. You could talk in circular language about what happens. But notice is not the decisional turning point on these types of cases, even if it may be a fact which may be argued to the jury. That's for the jury to decide. Or they may not be able to, the plaintiff may not get by a directed verdict. Sure. But in the summary judgment, correct me if I'm wrong, in the summary judgment motion filed by Gil Bain, they argued two bases to be dismissed from the case on summary judgment. Gil Bain did not get notice of the work performed by Trebasi and that Gil Bain exercised its supervisory responsibility with reasonable care. That seems to me to be a concession that they had control and they acted reasonably, which by most analysis is a fact question that should be set to the jury, not decided on summary judgment. That's absolutely right, Your Honor. Again, we agree with you. And the thing that I would add to that is we discussed this throughout the litigation in my latest brief and discussed in their supplemental brief as well. I think the key isn't necessarily the word notice. The question is that word that Justice Gordon used in the Cochran case, which appeared throughout some of the case law, precondition to liability. It's not necessarily the word notice that we're so troubled by. It's that word precondition to liability, because that does not appear in the jury instructions in Section 414. There's hints of it in comment B to Section 414 of the statement, but it certainly does not appear in those terms. So you think there's a fact question here that needs to be decided by finding the fact? Of course. I mean, we believe that there's overwhelming evidence, but at the very least there's so many fact questions about the, as Justice Mason began, with what the electricity was in the building, what they should have done, what this Gilbane safety plan told them to do, what the responsibility was from AT&T to Gilbane, what was passed off to Geary, what was in those contracts. And then there was a major argument by the defendant in the circuit court regarding PPE. There's all sorts of questions about whether or not PPE is personal protective equipment. That's rubber gloves in this case. There's fact questions about whether or not he should have been using that, whether or not that was actually feasible, whether he could fit his fingers into that circuit breaker. As you'll recall, he was connecting leads, whether or not he could actually use that. There's testimony. Either way, those are all fact questions for a jury to decide, for a jury to decide whether or not those experts that we presented, that they presented are credible or not credible, whether or not those experts' weight, based on the heft of their resume or lack thereof, should be weighted in a different manner than other experts. That's the promise of the jury. That's what juries are supposed to do. And we believe that they have been so overwhelming that, of course, it should be to a jury. And would you agree, another softball coming your way. Get ready. Would you agree that Cleary articulated that the contracts involved in the construction project should be consulted to decide whether the issue of control has been met? Absolutely. Connie said it's the best indicator, but also left a big amount of wiggle room. Even if the contracts didn't say, you can look at the evidence. So it used both. It didn't restrict you to the contract, but it said, contracts are the best indicator was the phrase. So is it the plaintiff's position that if there is retained control, the question of whether the party that possessed the retained control exercised it reasonably must always go to a jury? We can't say always. My question is, what do you make of comment B that talks about notice of, the contractor's notice of the manner in which the sub was performing the work as being relevant to the determination of liability under 414? First of all, comment B doesn't use the word notice. It uses the phrase knew or should have known, I believe. Commonly the formulation of notice. Again, I've been talking to myself and members of our firm in circles about what's the difference between notice, knew or should have known, and actual or constructive knowledge. It doesn't come out as a distinction until you're actually reading the jury instructions. So the jury instructions for 414 are in the 50 series, and they use the duty analysis like the person in control has, for safety of the work, has a duty to, forgive me, I don't know if they're correct words. Then I'll go on to the issues instruction, and I'll say the person in control has a duty, and then I'll say this person was negligent in these following manners, and then the approximate cause of the damages. Whereas the issues instruction in the owners and occupiers of land section, in section 120 of the jury instructions has five or six elements, and in one of those elements is actual and constructive notice. So it has an owner and occupier of land has a duty, and then there was some active negligence, and then the plaintiff also had to prove actual and constructive knowledge. That simply isn't something that the plaintiff has to prove in the 50 series in the jury instructions. And so that's sort of a circular way of showing or answering a question, but that's how it presents as a difference. And I know the defendant pointed out on this supplemental brief that we didn't cite any authority for that argument, which we made in our opening brief in our supplemental brief, but that argument has appeared a number of times. I don't blame the defendants for doing it because it makes our job harder, but that was the question that was addressed in the Reed v. Walmart case, I believe it came out in 1998, and the case of Wells v. Colonial Heights, which was decided in our, which came out in 2013, that was actually my case. That argument regarding actual and constructive knowledge and how that plays into the negligence analysis was decided in both Reed and Wells, and it appears in this case, unfortunately, it appeared in the Cochran case. And I think the other distinction is, so, the Reed case concerned the creation of a negligent environment, and that's where that comes in, and the actual constructive notice part comes from the owners and occupiers of lands, because someone else created it. So if someone put something on the floor which was dangerous or created a slippery condition like which may have been the case in Reed, versus someone dropping a piece of wood on the floor on someone, and whether or not there was actual notice, meaning somebody saw it, or it was there for such a long period of time that they had constructive notice because any good store proprietor might have seen it. So I would refer the court to both the Reed case and the Wells versus Colonial Heights case. That perhaps makes that distinction better than I'm able to argue it here. And I'd also note that Justice Tice may or may not have picked up on that distinction as she could have used that language which was replete in at least one line of case law, starting with the Cochran case, and I believe Diaz used that language as well. But she did not use the words notice or actual or constructive knowledge. She just stuck to control. It may be something that we could argue to a jury that might make a great jury trial, but it's not the, as Justice Pierce says, it's not paramount importance as it is, as it would be in the premises liability cases. Anything else? One last point, and it would be, in my opinion, dicta if you decide in this case. But the language from Justice Tice's opinion regarding post remedial measures, I'm not sure that it rested on the best authority. I believe this court, to the extent that it does mention it, I believe it would be dicta. But I just want to make sure, as this court sits as a precedent-setting body, just to take care that the post remedial measures decisions, as started in Herzog and other cases, do remain in place. And I believe that the decision in Carney simply was a fact-based decision based on the owner of the property having so little control over the bridge in that case. With that said, we'd ask this court to find that there are numerous genuine issues of fact. We'd ask that the court reverse respectfully Judge Flannery's decision and send this case back to the trial court for a jury trial. Thank you. Thank you. Thank you. May I please have the court? My name is David Sethi and I represent defendant Gilbert Building Company, the employee in this case. We're here today because this court has asked us to make briefs on the Carney decision and its effect on the outcome of this case. We ask the court to affirm the lower court's entry of summary judgment on behalf of Gilbane, both pursuant to Carney and Section 414, both under the comment C factors for control and under the notice requirement in comment B. A plaintiff correctly argued that there are not two theories of liability under Section 414. The court in Carney instructed that there's only one theory of liability. Vicarious liability, it said, is a principle of agency governed by other parts of the restatement. The direct liability theory, however, did not change in the way that my opponent proposes. The test for determining control is still the comment C factors that have always been used in 414 by Illinois courts. And the court's silence as to comment B should not be read as eliminating that notice requirement from that comment. Where does it say notice in comment C? In comment B, it does, Your Honor. Comment C, it doesn't say. No, it does not. There's no notice requirement in comment C. Okay, in comment C it says, in order for the rule in this section, 414, to apply, the employer must have retained, quote, at least some degree of control over the manner in which the work is done. Does that not apply in this case? It does, Your Honor. We agree. So you're agreeing that Gilbane retained at least some control over the manner in which the work was done by Gervasey. No, Your Honor, we don't agree that Gilbane controlled the work under the comment C factors. Why not? Because the ultimate question that's asked in comment C, what Carney specifically pointed out, was that where was the contractor free to do the work entirely in its own way? Well, the question is, did Gilbane retain at least, quote, at least some degree of control over the workspace? Yes or no? Not within the context of the comment C factors, because I do believe it's necessary to ask the second half of that question, such that the contractor was not free to do the work entirely in its own way, because the courts in Illinois have traditionally said, even retaining some basic levels of supervision and control, such as the right to coordinate, schedule, et cetera, is not sufficient to trigger liability under Section 414. And that's why you need to ask that follow-up question of, within comment C, such that the independent contractor was not free to do the work entirely in their own way. So you're saying that, excuse me, you're saying that Gilbane, I'm sorry, Gervasey's employer could do the work any way it wanted it done without any control from Gilbane? I'm saying that the very basic levels of supervision that Gilbane employed on the job site did not control play this work such that they were not free to do their own work in their own way, and I think that... Well, were they supposed to provide that level of control so that they could stop him from doing the work in an unsafe manner? Did they have the right to do that? They had the right to stop work. They had the right to stop unsafe work. They had the right to provide general directions, but... This is Gilbane. They had the right to do that. To provide general direction and supervision over the job site, but they did not control the work such that he wasn't doing it in his own way, and the way that the question was asked, I believe it's not what Section C is asking in terms of, we're not, Gilbane's not required to stop him from doing his work unreasonably. So if Gilbane saw this man sticking his hand into a hot electrical fire, they were within their contractual duties and obligations to do nothing, to not stop him? They could just ignore it? No, I don't think that that would be correct, but... So if they had a general work plan, 64-page project work plan, that provided for the safe work environment, that had to be followed, right? Otherwise they could stop the contractor from doing the work contrary to the 64-page plan. They had that authority to do that, correct? They had the authority to stop the work, correct. Right. Now whether they stopped it or not is a whole different question. Would you agree? Yes. Okay. And the evidence is that the plaintiffs have experts saying that under the work plan and under the contract, Gilbane had control to the extent that they could have stopped Gervase from doing what he did. Your Honor, I think Judge Flannery said it best. No, no, not what Judge Flannery said, what the experts said. What he said was that experts can't change the facts. And the facts were, according to Judge Flannery, that Gilbane didn't know about. And the experts are saying that he should have known about it. Many of the same facts that go to control will also go to notice. And so, and Gilbane has always argued in this case from the very beginning, because of plaintiff's argument, that even under the vicarious liability comment C factors, it did not have control. There are no vicarious liability comments in 414. And there's certainly none in comment C. It says retain control. Some control. Not vicarious liability. Your Honor, I was talking about previously in the briefs when that was the law in the first district. We did make the argument that under the comment C factors, we didn't have control. That's all I was saying. But you would agree that Gilbane retained control over the white worksite? No, Your Honor, I would not agree that Gilbane retained control over the worksite. How did they give it up? Did they ever have control over the worksite? They had control over scheduling, over coordination. But according to the contract's basic role there, it was only their one representative pursuant to the agreement with AT&T. AT&T never required them to have a full-time supervisor on the job site. And that's part of the reason why they retained Gary Electric, who were considered experts in their field, had done work at AT&T facilities, had done tie-ins many, many times before. And ultimately, with regard to controlling the work via the safety plan, it does matter if, as many courts have said, even if you have a comprehensive safety plan that is not per se dispositive of the control issue where the facts, the conduct of the subcontractor demonstrates otherwise. And here, this is a very unique case in that unlike other cases, the power court cases, we know what Gary Electric's practice was before this project and plaintiff's during the project and even after the accident. And always, they always performed the tie-ins while opening up the breakers, while we break the boxes, de-energize. And they never asked to shut it down. Plaintiff's own opening brief on page 9 says that's their responsibility to tell Gilbane when to shut it down. It was their responsibility under the safety plan to carry out the safety plan. But if somebody routinely performs negligent acts and never causes damage or injury, does that eliminate the negligent act the time it does cause an injury? If I speed down the sales street at 100 miles an hour at 10 o'clock in the morning and never strike a pedestrian, the time I do strike a pedestrian, does that make me not negligent because I did it before and nobody stopped me? It doesn't make any sense. Your Honor, I agree it would make you negligent. But whether it makes the person that hired you negligent under this analysis would depend upon an overview of the entire record. And the contract that Gilbane agreed to put them in control over the job site safety and the method of procedure, safety plans, and the provision of a safety officer. Now, granted their safety officer abandoned his responsibilities because over time he just told the subcontractor, go ahead and do it without my approval. But that doesn't mean he gave up control. They still had control. He just didn't exercise it according to the complaint. Now, a jury may see it your way, but you don't see a fact questionnaire about whether they had control or not? I don't, Your Honor, because courts have instructed not any one of these factors are dispositive, including the safety plan. Tom Pearson wasn't a safety officer. He was the project manager. And the whole issue about abandoning his responsibility in that regard with regard to making temporary hookups to the breaker boxes, all that happened there was that every time they had a Tom Pearson, they also had to go to JCI because JCI was in charge of the building equipment. Tom Pearson, because he's not there every day, said if I'm not there, you can't go straight to them. Tom Pearson wasn't being notified because he was in control of their work. He was being notified because he was there to coordinate the work. The biggest legitimate concern. Didn't Mr. Pearson have to approve the additional charge when Gary did a hookup? He had to approve the additional charge. Right. So was his involvement, did his involvement in the process of approving the temporary tie-in, did that have anything to do with safety? No, it did not. And what was discussed earlier, I believe Judge Pierce asked the question about the post remedial measure and Tom Pearson on the method of procedure form, which Tom Burke, Gary's head representative, said, these were not safety documents. This was a document, again, if you were going to affect critical equipment, then you needed to put one together because it needed scheduling, needed coordination, needed to be set up. But after the accident when Tom Pearson said, listen, this is what happened, put it on there, that should be used as a suggestion because of what happened next. Not only before this project, not only during this project, but after the accident, the Gary Electric individual, Steve Soltis, tried to use gloves and he couldn't. And so what did he do? He took it off and he connected it the way that he thought was safe without the gloves. He didn't go tell Tom Pearson. He didn't go complain to Tom Pearson. He didn't say we needed a third option. He went back to doing it the way he always did it because he was always in control. That specific provision about electrical tie-ins and the safety plan, first of all, the Gary Electric people weren't asked about that provision by plans council in terms of did it adhere to your work, but they were very clear in their depositions that that provision wouldn't apply because it's talking about not working on energized equipment. And they repeatedly said, you're not working on energized equipment. You're not working on live equipment, which is also the way it's written in the safety plan. Even plaintiff's experts, they said when they described the inside of that box, they described it as being de-energized. Perhaps most significantly with plaintiff's experts, Frank Berg, in terms of control, said this is the way it should have happened because he all along said you can do this with PPE or you can ask to shut it down. But he said first they would try to deal with PPE and then when they figured out they couldn't, Gary Electric should have gone to what he called the powers, and said, hey, we need to shut this down. Why would they go to the powers? Because the powers retain control? No, because of coordination. Well, just coordination, not for any other reason. Yeah, I think that's clear from the record from Tom Berg and Steve Soltis that if you shut down that MCC, there's critical equipment attached to it. Both Tom Peterson and Tom Berg and Steve Soltis all testified uniformly that if at any point Gary Electric wanted to shut these down, they would do so if they felt it was unsafe. They would ask Tom Pearson and Tom Pearson said, I'm willing to shape that process. Nobody was going to put safety to the side. I mean, Gilbane would never do that irrespective of if it results in liability. But it was all along Gary Electric's determinations as to how they would perform their work. And this post-remedial measure actually demonstrates it. They had nothing to say about it. No. Gary Electric always performed their work entirely in their own way. And Gilbane could not affect that in any way. Gilbane had the right to stop work. Gilbane had the right to do certain things. But that doesn't give rise to the level of control because it's necessary to trigger liability in a 414 analysis when it doesn't change their work to do their work entirely in their own way. If a jury heard evidence that Gilbane had the right to stop the work, could a reasonable jury conclude that they failed to stop the work and that failure resulted in injury to the plaintiff? Could a reasonable jury find that? Or could a reasonable jury find, nah, that's not enough? I believe a reasonable jury would find that's not enough. Ah, but they could find that it was enough to dictate that Gilbane had control. They could find that, couldn't they? A reasonable jury, I don't think would. Any jury could find anything. But I think a reasonable jury here is going to look at the facts. What earlier Judge Mason mentioned about how Gary Electric always thought this was a safe procedure is true. Even after the accident, even in their depositions, they continued to maintain the way they did this was safe. It was permitted by law, by the safety, by everything. And they really thought this was a once-in-a-million occurrence where a breaker blew up unexpectedly. And they had their claims against JCI and AT&T for that breaker blowing up. Let's answer your question first. They had claims against JTT and AT&T and Cleary, is it? Was it? The employer was Cleary. Gary Electric. So they had claims against everybody but the general contract who had the 64-page safety plan and had control over the, had the ability to stop the work. They were the only ones that had no potential exposure for this accident. That's your argument. That's your statement and you're sticking to it. I believe it is the right answer, Your Honor, because the question of control under connoissee is, was Gary entirely free to do the work in their own way? And I think the answer to that is yes. But it does go also to the notice requirement, which has been a big issue of dispute between the parties. And while, you know, counsel was correct in stating what direct liability would be under, what control would be in a direct liability claim under 414, we think he's wrong when it comes to notice. The notice requirement has always been part of Illinois law in terms of, Illinois courts have always adopted the restatement as an accurate recitation of Illinois law. No court has ever said Section B is not part of that. And to say that Carnegie or Cochran made the notice requirement up also isn't true. There's at least two appellate court cases that we found where they included Commit B, the notice requirement for Commit B in the instruction of what the legal standard is for 414. Have you found any since Cleary? Since? The Supreme Court case. Tarnum. Tarnum. Sorry, Tarnum. After Judge Tice, Justice Tice specifically said that 414 deals with control, not vicarious liability, not notice, that contracts are important to decide whether control exists even though that level of control wasn't found in Carney. Have you found any cases that support your position since then? Your Honor, there is a hesitant sense, I don't know the right way to answer that except to say there is no published decision. Is there an unpublished? There is. Which one? I forgot the name of the case, but it's against power of construction, I believe. And I'm not sure if they did the analysis, I can't say that, but I know that they included the Commit B notice requirement as part of the rule. And I think that some cases don't go that far because if you don't find control, you don't need to do a notice analysis. And then there's other circumstances where the same facet of show control will show a significant amount of notice, such that constructive knowledge is there. But that's not going to be the situation every time. And the way Commit B is written, and again, no court has either removed it or clarified what it means, it's pretty clear that it says if a contractor performs work unreasonably, such that you, and if you knew or should have known about the way that work was being done, then you will be liable if you have the opportunity to prevent it. If you have the opportunity to prevent it. And that's what's key here. I think the most analogous case to ours is Calderone from the First District. And in that case, they did a Commit C analysis. It was under the vicarious liability heading, but it was still a Commit C analysis. And in that case, the defendant was similar to Gilbert, except they actually had somebody there on site. But they also had a safety plan in place. They also had basic safety rules. They had all the same types of elements that you've been pointing out, Your Honor. And yet the court ultimately found none of those things evidenced that the contractor controlled the way the work was done. And that was dispositive as to control. Now as to notice, what was dispositive was, and it's very similar to here, is that the contractor, the plaintiff argued, should have known that the plaintiff was going to get injured that day walking up the ladder while using the ladder because he had used the ladder 20 times before. But what was dispositive was that the contractor didn't know that he was walking up the ladder while carrying shingles. That's analogous to here. Tom Pearson knew that tie-ins were being made. Because Gary Letcherk has always made tie-ins. It's not in dispute. And both before this accident, before this project, during the project, and after the project. And they always did so safely. So nothing would have changed if he knew about it. Well, he knew that the tie-ins were being made. But he didn't know. But the plaintiff's experts say that that's negligent, even though it had been done in the past. Right? Isn't that what the plaintiff's experts say? That that's negligence to do it that way. That's basically what they say. Yes. They can't change the facts and they can't make those legal conclusions. But they're making that opinion. And if that opinion is there, doesn't that create a question of fact about whether they should have stopped it or not because they had the control to stop it? It's a fact question. I'm not even suggesting that you lose or you win. But for summary judgment purposes, it's a fact question. You say it wasn't negligent. Experts say it was negligent. That's summary judgment. But I think you need to look at the experts. Many courts will give perhaps the right way to say this, the adequate amount of credibility to an expert who's retained by one or the other side. And if you look at what Frank Berg says, he says you can do it while wearing PPE. He doesn't say you can't do it that way. He says, and if you do it that way but you can't use the PPE, then Geary Electric has to tell Gilbane or AT&T, the powers as he called them. That's what he described was the process. Plaintiff's own brief acknowledges that they had to tell Gilbane when they had to shut down equipment when something they were going to do was going to be live. So to impose that knowledge on Tom Pearson that they were not using PPE, that wouldn't be a fair acquisition of knowledge because he had no way of knowing that they were not going to use PPE when everything before that point indicated that the job they were doing was safe. And as Frank Berg says, and I normally put it in every brief but I have to say it again, in the room where he was in that data deposition, in the courtroom where the trial would occur, and everybody in America, he says, would expect that if you're not asking to shut down the equipment, you're going to be wearing PPE. Tom Pearson wasn't an engineer. He wasn't an electrician. There was no reason when Geary Electric did not tell him that they needed to shut down the MCC, they didn't tell them they had any safety issues, they didn't complain of anything, and they were freely in charge of performing their work in their own way, that Tom Pearson should be charged with liability in Gilbane. Under the Gilbane-Geary contract, who was responsible for day-to-day safety on the site? Geary Electric. Under the Gilbane-Geary contract, first the, and the obligations, and there are a few, and the AT&T and Gilbane contract passed down to Geary Electric, and it clearly states that Geary Electric is in charge of all supervision, all day-to-day monitoring, all safety, ensuring their contractors are safe, performing their work safely, and providing all tools necessary to carry out their work. That included, yes, as was pointed out, the safety plan, but it also said that Gilbane... Gilbane had that same responsibility, right? No, that, Gilbane's responsibility under the AT&T contract was basically divided in two depending on whether AT&T required them to provide full-time supervision. Because the same year that... Did the same year that they did? They did not. Right. They had the duty to provide a safety officer, right? They had duty to hold weekly subcontractor meetings. They had a duty of the highest importance on the health and safety of the work performed. They were responsible for safety, protection of work, and workers of contractor and subcontractor. This is under their contract with AT&T. Through the inspection of the project at the end of every workday, they had active control of the AT&T Gilbane safety plan. They couldn't walk away from that, as I understand it. They had the duty to identify energized equipment and arrange to de-energize under the lockout-tagout protocol. Those were their duties. Did they somehow become relieved of those duties that were not aware of? Well, to some degree, yes. And I will say that some of the requirements that you just listed, including the requirement to inspect every single day was not imposed on Gilbane because AT&T did not require Gilbane to provide full-time supervision on this project. But, yes, courts in Illinois have acknowledged that pass-through provisions are valid and they do move these obligations from the construction manager here at Gilbane to the sub. Now, that's not dispositive, just like nothing else in a 414 analysis is dispositive, whether it's a safety plan or a contract or the conduct. You have to take it as a whole. And at the end of the day, what I have to keep coming back to is, before this project, before that safety plan was in place, before that contract was in place, Gary was performing the times the same way they were during the project and the same way they ultimately did after the accident, even after Tom Pearson's suggestion. And under the Gilbane safety plan, it was the sub's responsibility to identify to Gilbane any equipment that needed to be de-energized for a lockout-tagout procedure to apply. Yes, they were charged with that. And that's in player's brief also. And Frank Berg acknowledged it as well. And is there any evidence in the record that prior to Mr. Geraci's accident, Gary ever identified to Gilbane any equipment that needed to be de-energized? No. I believe I'm hitting my time limit. No? No. We all are. We'll have as much time as we want to. Okay. Thank you. I do want to mention one thing in response to the question earlier about notice and how notice is a higher standard that belongs to 343 and not construction negligence under section 414. There is actually a case, the Beeson case, which is one of the courts before Cochran, that included the notice requirement as part of the legal standard. And when they're setting forth that legal standard, they actually cite to a case, and I forget the name, but I believe the defendant was Clark Construction, which was a premises case. But in that Clark Construction case, they actually analyzed the liability, or they actually analyzed notice within the framework of a construction project versus a premises owner. And they arrived at the opposite conclusion that the case is planned to discuss. They said when you're a construction contractor, you are relying on experts to perform your work. And in that case, it was an electrical subcontractor. And so it's reasonable to rely on them. You're going to have less of an obligation to go and make the inspections and make sure every single little step they're doing is safe, as opposed to somebody just on your premises who's not going to have that level of sophistication. And that reasonableness determination was either put into the record by an expert, right, or other contractors or laborers or whomever. There was facts in there that would support the conclusion that the facts deem this conduct to be reasonable. And at a summary judgment stage, the facts here are reasonable, unreasonable. It's a fact question. Correct? It's a fact question. You're right, Your Honor. And I don't think it's an opinion question as to what the experts are opining of their view of the facts shouldn't restrict the court. Otherwise, realistically, we would never ñ nobody would ever grant summary judgment. That realistically is probably should be exercised more often. Many times summary judgment is granted where there are fact questions prohibiting the determination via summary judgment. That's why summary judgments frequently get reversed because of the fact question. Isn't it better for the jury or fact finder to make that decision about whether the contractor retained control or not, given these contractual provisions that appear to give the contractor control over the worksite? I agree that fact questions should go to the jury. But I don't agree that experts can create fact questions. And just because an expert provides an opinion that says, irrespective of what Gilbane's contract said or how the conduct was on the worksite, whether Gary was selecting their work methods the entire time, Gilbane should do more. They should always do more because I say they should do more. I don't think that that creates a fact question. The fact question is based upon the record. And in the record here, and there are concessions by Frank Berg, which I think are glaring, because he had no choice based on the record, that Gary Electric always had the right to do the work entirely in their own way. Gilbane, whether it was a safety plan or anything else, never controlled that, never changed their work. It never altered it. Well, that may be. But could they have? Did they have the authority to do that? That's control. Did they retain some degree of control? Some. Not all. Some. And as I understand your argument, Gilbane retained the right and some control over the worksite. That's 414. You're right as to half of the argument, Your Honor. But the other half of the argument is that you retain control such that the contractor is not entirely free to do work in their own way. There is a threshold which you have to pass. It's just not any right to stop work or to supervise work or to provide a safety plan, which they may or may not be strictly following. They're in charge of carrying out, which was the case here. Ultimately, you take all of those facts together. You take the whole record and you ask, ask the control, was the contractor entirely free to do their work in their own way? If the answer to that question is no, then it goes to the jury. Absolutely. But if the answer to the question is yes, then control under the common seat factors is not shown and similar judgment is appropriate under the common seat factors, similarly under notice. Was there anything that required Gilbane to be on site when Mr. Soltis was performing the tie-in after the accident so that they could look over his shoulder and say, put on that personal protective equipment. Don't do it without it. No, there was not. Thank you. Thank you. Thank you. As to that penultimate point about whether or not the jury was free to do the work in its own way, as we've said throughout this litigation, it certainly was not free. A safer method was prohibited because of the AT&T policy to keep the electricity on so the telephone service was not interrupted. Sure, that may have been a great policy in general to keep the phone service on, but if you're going to have that policy, which is fine, on behalf of Jeff and all the other workers, we just ask that you make some other provisions when workers have to go in front of live equipment, which is at 480 volts. Jeff had no authority to turn off that motor control center or that juice. And when AT&T and JCI had a policy, as you say, that the MCC could not be powered down, did Gilbane have any authority to override that? Absolutely. They could have presented an MOP. They had active control over the safety. I guess my question is, when Mr. Soltis goes to JCI and says, we need to do a temporary tie-in, I've identified a breaker that I don't think is being used. Can I use it? JCI says, yeah. He says, well, could we power down the MCC just to make it 100% safe? And JCI says, no, you can't do that. Are you saying there's something in these contracts that allow Gilbane to overrule that, the property owner's determination? Right, the Gilbane safety plan, which says, electrical tie-ins shall be conducted only on de-energized, locked out, and tagged out systems. If the condition makes this procedure impossible, then a pre-tasked safety meeting with Gilbane is required. All such live work shall conform to NFPA 70E, most recent edition. So the answer is yes, under that provision, under the Gilbane safety plan, they had the right to do that. And if they could not do it, they could have a pre-tasked safety meeting. And in fact, they were doing that when Tom Person, as we said, he decided approximately a month or five weeks before the accident, when Tom Person decided that when air comfort needed a welder tie-in, did not have to contact Gilbane, but rather go directly to Geary. How was the procedure performed any differently before Mr. or while Mr. Person was involved as opposed to after? Did he have anything to do with safety? He was in charge of safety. I understand that under the contracts, but in reference to this particular procedure, there is a particular procedure that is performing a temporary tie-in. Mr. Person's role was that he got the call from Geary saying we need to do a temporary tie-in for one of the welders. He says, okay, I approve the charge. He's got to do the work. Then Geary goes to JCI, says we found a breaker we think we can use, can we use it? And JCI says, okay, what does Person have to do with safety in that scenario? And that was consistent throughout. He had the ability to create an MOP. And the experts discussed whether or not an MOP was required. That's question of fact. That goes to the jury. Whether, as Justice Pierce said, you know, if you're driving down LaSalle Street, whether or not, you know, it's the hundredth time you get caught, this may or may not have been the hundredth time that tragically this happened to Jeff, but it was, we would say he should have been instituting this MOP from the get-go. Okay, so the MOP is in place. And the MOP says do this only with personal protective equipment on. And Geary does it every time without, both before and after the accident. Where does Gilbane come in there? Gilbane said do it with personal protective equipment. And they just didn't. They didn't want to. At least it had done something. So that would be another question of fact. One other allegation or third amendment complaint is that, as Brian Vandal said, they should have hired an electrical engineer. Tom Person wasn't necessarily qualified to make that call. Geary wasn't necessarily qualified to make that call because they weren't engineers. How long had Geary been working on that building? Honestly, I cannot remember. But it had been on and off, and certainly they're a reputable company. There's no question about that. But we have alleged, and our expert says, that an electrical engineer needed to be consulted on this project. Whether or not you believe that's true or not, that's a fact question that needs to go to the jury. And I hope that that's answering your question. There was a question about whether or not the comment B was anything to that regard or cited after the Carney decision. I went and looked last night, and I couldn't find anything regarding that. All of these, the language regarding notice and actual constructive knowledge appears to be something that is somewhat unique to Illinois. I did a Westlaw search last night, and there were 75 cases when you look in a certain search. I can't tell you what it was before the court, but it was largely confined to Illinois, and I believe that was because the language began in Cochran. It isn't my, and I may be wrong, but it is my opinion that that language is essentially confined to Illinois. Obviously, there's going to be exceptions in the case law, but certainly after Carney, as I've said in our supplemental brief, that language that began in Cochran is gone, or should be removed from the precedential jurisprudence of this court, just as Justice Tice removed the vicarious liability language. I believe that those sort of left our case law, so to speak, at the same time. Lastly, there's a lot of levels of control in this case. Gilbane was in position the whole time to prevent this accident. Workers in Illinois have the right to understand that they may go into dangerous construction projects, and someone may be there to look over their well-being, therefore they can concentrate on their own jobs. That's our argument. That's the argument we should be able to make to a jury, whether or not a jury accepts it or not. Certainly, Mr. Gerasi would like to make that argument for the jury. Corwin, we'd ask this court to reverse, respectfully, Judge Flannery and send this matter back for a trial in the Supreme Court. Thank you. Thank you. Thank you both, counsel. Excellent arguments. And for all the briefs that you prepared, we have a lot to think about and we'll take it under consideration. Thank you very much. We extend reason. Thank you.